United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

R. K. MAUZEY,                                 No. C 05-5392 MHP (pr)

       Petitioner,                               **ORDER OF DISMISSAL**

   v.

A. P. KANE, warden,

       Respondent.
                                    /

**INTRODUCTION**

       R. K. Mauzey, a California prisoner incarcerated at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. His petition is now before the court for review pursuant to 28 U.S.C. §2243 and Rule 4 of the Rules Governing Section 2254 Cases.

**BACKGROUND**

       Mauzey's habeas petition does not concern his conspiracy to commit murder conviction but instead concerns five rule violation reports ("RVRs") issued to him in prison. Mauzey received RVRs for his conduct on March 2, 2004, June 28, 2004, July 21, 2004, November 10, 2004 and September 20, 2005. He alleges he lost time credits when he was found guilty on each of the RVRs, although this allegation is contradicted as to the June 28, 2004 by the RVR that states that no time credits were forfeited. See Petition, Exh. B.

1   Mauzey accumulated the five RVRs for refusing to be interviewed by corrections staff
2   in a room with the door closed.  The same basic fact pattern led to each of the five RVRs:
3   (1) a correctional counselor would call Mauzey into an office to interview him, (2) Mauzey
4   would refuse to enter the office and/or to close the door for an interview, (3) Mauzey based
5   his refusal on the ground that he would look like a confidential informant and be in danger if
6   he allowed himself to be so interviewed, (4) a direct order to enter the room and/or close the
7   door would be given by staff, (5) Mauzey would refuse the order, and (4) an RVR would be
8   issued against Mauzey for refusing a direct order or refusing to interview, see 15 Cal. Code
9   Regs. § 3005(b).  On one occasion, Mauzey also declined to be interviewed without his
10  attorney present.  Petition, Exh. B.  On another occasion, he refused to enter the interview
11  room because he did not have an attorney present and allegedly was invoking his Fifth
12  Amendment right not to incriminate himself.  Petition, Exh. E.

13   Mauzey contends that if he had complied with the direct order to enter the room and
14  shut the door, he would have been assaulted.  He anticipated an assault not by the guards, but
15  rather by other inmates because he would have been deemed a "rat"/confidential informant if
16  he had closed the door and sat down for an interview.  See Petition, p. 11.  Mauzey raised
17  this assault concern in each of the hearings on the RVRs, without success.

18   Mauzey contends that his rights under the Eighth and Fourteenth Amendments were
19  violated by the issuance of the five RVRs.  He also alleges that he was denied his right to
20  have an attorney present during the interview.

**EXHAUSTION**

22  Prisoners in state custody who wish to challenge collaterally in federal habeas
23  proceedings either the fact or length of their confinement are required first to exhaust state
24  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the
25  highest state court available with a fair opportunity to rule on the merits of each and every
26  claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).

27  Mauzey asserts that he exhausted state judicial remedies as to the claims raised in his
28  federal petition.  This allegation is incorrect as to the September 20, 2005 RVR, because his

2

1 petition for writ of habeas corpus in the California Supreme Court did not mention the
2 September 20, 2005 RVR and therefore could not have exhausted state judicial remedies as
3 to it. See Petition, Exh. L. The claim concerning the September 20, 2005 RVR therefore is
4 dismissed without prejudice to Mauzey filing a new petition after he exhausts state judicial
5 remedies for that claim.

## DISCUSSION

A.  Standard Of Review

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A district court considering an application for a writ of habeas corpus shall "award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto." 28 U.S.C. § 2243. Summary dismissal is appropriate only where the allegations in the petition are vague or conclusory, palpably incredible, or patently frivolous or false. See Hendricks v. Vasquez, 908 F.2d 490, 491 (9th Cir. 1990).

B.  Mauzey's Claims

1.  State Law Claim

Mauzey contends that he was punished "for failure to participate in an illegal activity which would have led to physical violence against his person." Petition, p. 6.1. Mauzey alleges that "the interview/investigation policy" at Soledad is "illegal" because it does not meet the criteria established by the United States Supreme Court in Turner v. Safley, 482 U.S. 78 (1987), and is an "underground regulation" not allowed by state law. Petition, pp. 8-9. There is no regulation or even a written policy for the "'ad hoc interview/ investigation policy." Id. at 9. Mauzey does not identify the policy with any particularity, although it appears that the policy is that an inmate can be interviewed in a closed-door session during an investigation at the prison. Prisoners either cooperate or are punished. See Petition, p. 10.

3

1 Even if Mauzey could establish that there was a policy and it was not properly 2 promulgated under state law, he would not be entitled to relief here because a federal habeas 3 court cannot grant relief based on a violation of state law. See Estelle v. McGuire, 502 U.S. 4 62, 68 (1991); Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).

Mauzey's citation to Turner v. Safley, 482 U.S. 78, does not advance his cause. Turner provides the framework for a court to analyze a regulation that impinges on a federal constitutional right but does not create a constitutional right. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89. Turner presupposes that the regulation would otherwise violate a constitutional right. Turner alone thus cannot provide a basis for habeas relief: Mauzey would have to point to a regulation that impinged on a constitutional right and then Turner might be applied to determine whether the regulation was otherwise valid. It is questionable whether Turner would even apply to an "ad hoc policy," Petition, p. 9, as opposed to an actual regulation.

2. Eighth Amendment

No Eighth Amendment violation occurred under the allegations of the petition. Mauzey chose not to go into the interview room and therefore, under his reasoning, did not have his safety endangered and did not suffer an Eighth Amendment violation. Habeas relief is not available when a constitutional violation has not occurred because it cannot be said that the petitioner is being held in violation of the constitution, laws or treaties of the United States, as required for relief under 28 U.S.C. § 2254.

Assuming arguendo that Mauzey could show that entering and closing the door to the interview room would have put him in danger, he would have only established one element of an Eighth Amendment violation. The Eighth Amendment requires that prison officials not be deliberately indifferent to a known risk to an prisoner's safety. See Farmer v. Brennan, 511 U.S. 825 (1994). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. See id. Prison officials have several ways to deal with threats to an

4

inmate's safety, such as putting him in protective custody, transferring him to another prison, or transferring the threat source to another prison.  Because prison officials had various methods to deal with dangers to an inmate, it cannot be said that an Eighth Amendment violation occurred when they were never even given the opportunity to choose how to address any risk that might have been created.  An Eighth Amendment violation was only a speculative possibility if several things lined up as Mauzey guessed – i.e., if he entered the room and shut the door for an interview (which he did not), if other inmates perceived him to be a confidential informant (which he only speculates would occur), if he alerted prison officials to a perceived danger (which he did not), and if prison officials failed to take any steps to abate the risk of serious harm to Mauzey (which he does not even speculate whether they would or would not have done).   In sum, even if Mauzey had involuntarily participated in a closed door interview, there still would not have been an Eighth Amendment violation.  That violation would not have occurred unless prison officials had learned of a serious risk to his safety and been deliberately indifferent to it.  Mauzey's Eighth Amendment claim is meritless.

     Any danger to Mauzey and other inmates would be magnified significantly if the court accepted his theory.  If the court endorsed the idea that an inmate could refuse to participate in a closed door meeting because he would be perceived as a confidential informant, several problems would arise.  First, any inmate who participated in a closed door meeting would be in greater danger because of the official endorsement that a closed door meeting always means that an inmate is informing on other inmates.  Second, inmates would feel increasingly influenced by that part of the prison population that seeks to enforce an illegitimate code of silence.  Third, if Mauzey could declare that this procedure put him in danger and therefore justified his refusal to comply with rules, he (and other inmates) could declare other procedures put them in danger and therefore justify disobeying other orders.  For example, if a riot between prison gangs occurs and inmates are ordered to get down, an inmate could continue fighting to show his allegiance to his gang in order to avoid being in danger from that gang for not continuing to fight.  Allowing inmates to pick and choose which orders to

obey will quickly lead to complete chaos in the prison. There might be an order where the illegality of it is so immediate and outrageous that disobedience might be allowable -- e.g., an order to "come over here so I can shoot you" -- but the orders to Mauzey were not of that kind. The constitution does not require prison officials to allow inmates to disobey orders based on speculation that a rather routine order will ultimately result in a danger to him.

Mauzey asserts that he had a right to refuse an illegal order which would have resulted in violence from other prisoners, citing Pennsylvania v. West Virginia, 262 U.S. 553 (1923). That case had nothing whatsoever to do with prison rights and therefore does not persuade the court. See id. at 581 ("These are suits, one by the commonwealth of Pennsylvania and the other by the state of Ohio, to enjoin the state of West Virginia from enforcing an act . . . which the complainants believe will largely curtail or cut off the supply of natural gas heretofore and now carried by pipe lines from West Virginia into their territory and there sold and used for fuel and lighting purposes.") Pennsylvania v. West Virginia does state that a plaintiff (but not a prisoner in particular, as Mauzey's quote states) "does not have to await the consummation of threatened injury to obtain preventive relief." 262 U.S. at 593. But that statement was with regard to whether the civil suit was ripe, see id. at 593-95, and not with regard to disobedience of orders to prisoners or the availability of habeas relief. In short, the misquoted statement taken out of context does not provide legal authority for his claim.

    3.    Due Process

        a.    The Interviews

There was no Fourteenth Amendment violation in the interview process because Mauzey had no protected liberty interest in not being interviewed in the room with the door closed.

Interests that are procedurally protected by the Due Process Clause may arise from two sources--the Due Process Clause itself and laws of the states. See Meachum v. Fano, 427 U.S. 215, 223-27 (1976). In the prison context, these interests are generally ones pertaining to liberty. Changes in conditions so severe as to affect the sentence imposed in an unexpected manner implicate the Due Process Clause itself, whether or not they are

6

1 authorized by state law. See Sandin v. Conner, 515 U.S. 472, 484 (1995) (citing Vitek v.
2 Jones, 445 U.S. 480, 493 (1980) (transfer to mental hospital), and Washington v. Harper, 494
3 U.S. 210, 221-22 (1990) (involuntary administration of psychotropic drugs)).  This is not a
4 case involving changes so severe as to implicate the Due Process Clause itself.

5       Deprivations that are less severe or more closely related to the expected terms of
6 confinement may also amount to deprivations of a procedurally protected liberty interest,
7 provided that state statutes or regulations narrowly restrict the power of prison officials to
8 impose the deprivation and that the liberty in question is one of "real substance."  See id. at
9 477-87.  A state most commonly restricts the power of prison officials by a two-step process:
10 (1) establishing "substantive predicates" to govern official decisionmaking, i.e.,
11 "particularized standards or criteria to guide the [s]tate's decisionmakers," and then (2)
12 requiring, "in explicitly mandatory language," that if the substantive predicates are met, a
13 particular outcome must follow.  See Kentucky Dep't of Corrections v. Thompson, 490 U.S.
14 454, 461-64 (1989).  An interest of "real substance" will generally be limited to freedom
15 from restraint that imposes "atypical and significant hardship on the inmate in relation to the
16 ordinary incidents of prison life" or "will inevitably affect the duration of [a] sentence,"
17 Sandin, 515 U.S. at 484, 487.

18       There is some uncertainty as to whether Sandin has eliminated the requirement that
19 state law narrowly restrict the power of prison officials to impose the deprivation and instead
20 requires only that there be an interest of real substance to determine that an inmate has a right
21 to due process before being deprived of that interest.  In Sandin, the Court criticized earlier
22 decisions that focused on the language of the regulations rather than the nature of the interest
23 because they "encouraged prisoners to comb regulations in search of mandatory language on
24 which to base entitlements to various state-conferred privileges."  Sandin, 515 U.S. at 481.
25 The language-based approach in which courts and prisoners searched for negative
26 implication from mandatory language in prisoner regulations had "strayed from the real
27 concerns undergirding the liberty protected by the Due Process Clause."  Id. at 483.  The
28 Court reiterated that states "may under certain circumstances create liberty interests which

7

are protected by the Due Process Clause. . . . But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484.  See Jackson v. Carey, 353 F.3d 750, 755 (9th Cir. 2003) ("focus of the liberty interest inquiry is whether the challenged condition imposes an atypical and significant hardship"); Duffy v. Riveland, 98 F.3d 447, 457 (9th Cir. 1996) (implying that Sandin reformulated working definition of liberty interest to include only "real substance" prong).

While there may be some uncertainty as to whether the court needs to find mandatory language creating the liberty interest, there is no uncertainty at all that an atypical and significant hardship must exist to find that a liberty interest is protected by the Due Process Clause.  Sandin made clear the need for an atypical and significant hardship and the Supreme Court recently reiterated its adherence to Sandin's rule in Wilkinson v. Austin, 125 S. Ct. 2384, 2394 (2005).  Whether the due process analysis after Sandin has two prongs – i.e., (1) an atypical and significant hardship and (2) a state-created interest due to mandatory language – or just one prong, it is beyond dispute that at least the first prong is required.

Mauzey had no protected liberty interest in avoiding a closed door interview.  Being interviewed in a room with the door shut was not a restraint that imposed an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.  The interview process also did not affect the duration of his confinement.  His claim fails on the first prong of Sandin because he was not deprived of an interest of real substance.  If the due process analysis has two prongs after Sandin, Mauzey's claim would fail also on the second prong because he has not shown any regulation with mandatory language and substantive predicates.

The analysis above considers whether Mauzey had a protected liberty interest with regard to the interview procedure itself, and not whether he had a protected liberty interest in the disciplinary hearing that resulted from the refusal to enter the interview room and shut the

8

door.  As to the latter, he did have a protected liberty interest; as to the former, he did not.

          b.      <u>Disciplinary Hearings</u>

Mauzey had a right to due process at the disciplinary hearings which resulted in him losing time credits because loss of time credits apparently would inevitably affect the duration of his confinement.  The process due in such a prison disciplinary proceeding includes written notice, time to prepare for the hearing, a written statement of decision, allowance of witnesses and documentary evidence when not unduly hazardous, and aid to the accused where the inmate is illiterate or the issues are complex.  <u>Wolff v. McDonnell</u>, 418 U.S. 539, 564-70 (1974).  Due process also requires that there be "some evidence" to support the disciplinary decision.  <u>Superintendent v. Hill</u>, 472 U.S. 445, 454 (1985).  The Due Process Clause only requires that prisoners be afforded those procedures mandated by <u>Wolff</u> and its progeny; it does not require that a prison comply with its own, more generous procedures.  <u>See</u> <u>Walker v. Sumner</u>, 14 F.3d 1415, 1419-20  (9th Cir. 1994).

Although Mauzey had a right to due process in connection with the disciplinary hearings that resulted in the loss of time credits, he does not contend he was deprived of any procedural protection at the hearing on each RVR.  Indeed, it appears that he presented his argument that entering the interview room and shutting the door would put him in danger at each of the RVR hearings and his argument was never successful as a defense or factor in mitigation.  On the record now before the court there was some evidence to support the decision reached:  Mauzey admitted that he did not comply with the direct orders.  The fact that the hearing officers did not accept his defense does not mean that "the-some-evidence standard" was not met.  He has not presented a cognizable claim for a violation of his right to due process with regard to the disciplinary hearings.

          4.      <u>Right To Counsel</u>

Mauzey also alleges that prison officials should have granted his request to have an attorney present during questioning, saying that it "is well established law that all suspects have the constitutional right to counsel during questioning."  Petition, p. 12.  He errs.

9

The Sixth Amendment right to counsel attaches "only at or after the time that adversary judicial proceedings have been initiated against the defendant," such as by way of formal charge, preliminary hearing, indictment, information, or arraignment. See United States v. Gouveia, 467 U.S. 180, 187-88 (1984). Prisoners have no right to counsel in prison disciplinary proceedings; see also Wolff v. McDonnell, 418 U.S. at 569-70, or in proceedings to determine whether he should be placed in administrative segregation, see Toussaint v. McCarthy, 801 F.2d 1080, 1100-01 (9th Cir. 1986). Mauzey's denial of counsel claim is squarely foreclosed by the decision in Gouveia, where the Supreme Court considered the case of prisoners who were not allowed counsel during the investigation of their involvement in a prison murder. The Court concluded that "the Court of Appeals was wrong in holding that [prisoner] respondents were constitutionally entitled to the appointment of counsel while they were in administrative segregation and before any adversary judicial proceedings had been initiated against them." Gouveia, 467 U.S. at 192. Mauzey's denial-of-counsel claim has no merit.

### 5.     Fifth Amendment

Mauzey protested that he was invoking his Fifth Amendment right to remain silent on one of the occasions when he was asked to sit for an interview. There is no merit to a Fifth Amendment claim because there is no indication of unconstitutional compulsion: he was objecting to having to involuntarily enter the interrogation room, not to having been unconstitutionally "compelled . . . to be a witness against himself." See McKune v. Lile, 536 U.S. 24 (2002).

Mauzey's conduct was more comparable to someone refusing to go to the courthouse, rather than that of someone going to the courthouse and then refusing to answer questions. In each RVR he was charged with disobeying a direct order, and that direct order was not to speak but to enter the room and/or shut the door. The RVR for March 2, 2004 states that the officer "gave MAUZEY a direct order to come inside and close the door." Petition, Exh. A. The RVR for June 28, 2004 states that the officer "gave Inmate MAUZEY a direct order to come inside, close the door, and sit down." Petition, Exh. B. The RVR for July 21, 2004

10

states that the officer "gave Inmate MAUZEY a direct order to come in and close the door and if he refused he would receive a CDC-115." Petition, Exh. C.  The RVR for November 10, 2004 states that the officer "ordered him to step into the office and have a seat," told Mauzey "that I needed him to come into the office, have a seat and that I have some questions to ask him," and informed him "that if he refused to interview he would receive a CDC-115 for Disobeying a Direct Order." Petition, Exh. D.  The RVR for September 20, 2005 states that the officer "gave Inmate Mauzey a direct order to come inside, close the door and sit down." Petition, Exh. E.  Mauzey was disciplined for refusing a direct order to enter the room and close the door.  He never received an RVR for refusing to speak.  No Fifth Amendment violation occurred, as he neither made a compelled statement nor was he punished for refusing to make a statement.  Habeas relief is not available for a constitutional violation that did not occur.  Moreover, prison officials may require a prisoner to appear before an investigative/interrogation panel and, under some circumstances, even compel his testimony.  Cf. McKune, 536 U.S. at 38-44 (finding no unconstitutional compulsion where an inmate's participation in a sex offender treatment program was conditioned upon his admission of past criminal activity without the benefit of use immunity, and his refusal to do so resulted in his demotion to a higher custody status, the loss of amenities such as a personal television, less access to prison organizations and the gym area, a reduction in certain pay opportunities and canteen privileges, and restricted visitation rights); Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998) (no unconstitutional compulsion where inmate made to choose between incriminating himself at his clemency interview and having adverse inferences drawn from his silence); Minnesota v. Murphy, 465 U.S. 420 (1984) (no unconstitutional compulsion where defendant faced being returned to prison for 16 months if he did not answer probation officer's questions about other crimes); Baxter v. Palmigiano, 425 U.S. 308 (1976) (no unconstitutional compulsion where inmate faced 30 days in punitive segregation and downgrade of prison classification status if he remained silent at prison disciplinary hearing). Because the situation never reached the point of Mauzey being compelled to make statements, there was no Fifth Amendment violation.  It thus is

11

unnecessary to consider whether Mauzey faced a real possibility of incriminating himself; he had no constitutional right to avoid incriminating others if he wouldn't have been running the risk of making statements that incriminated himself in criminal activity. See Neal v. Shimoda, 131 F.3d 818, 833 (9th Cir. 1997) (for Fifth Amendment's protection against self-incrimination to be triggered, there must be a "real probability" that the State would use the admissions against the individual in a future criminal proceeding).

### 6. No Forced Choice Between Constitutional Rights

One of the main themes of the petition is that Mauzey was forced to choose between constitutional rights. However, as explained above, there was no constitutional right violated. Requiring Mauzey to be interviewed in a closed door session would not have required him to choose between any two constitutional rights. Cf. Allen v. City & County of Honolulu, 39 F.3d 936, 940 (9th Cir. 1994). Habeas relief is available for a person held in violation of the constitution, laws or treaties of the United States. The writ will not issue for violations that never occurred.

### 7. Non-Uniform Punishment

Mauzey asserts that he was one of only a few of the numerous inmates who refused to participate who was "prosecuted." Petition, p. 13. The allegations of the petition do not come close to showing any equal protection violation as Mauzey does not allege that prison officials decided who to discipline based on an impermissible standard such as race, religion or other arbitrary classification. See United States v. Armstrong, 517 U.S. 456, 463-64 (1996). Although the Equal Protection Clause prohibits prison officials from treating similarly situated inmates differently based on impermissible criteria, it does not require complete parity of treatment of all inmates. Mauzey's claim amounts to nothing more than a claim that not everyone was punished, but he does not show that others were similarly situated to him or that the choice of which inmates to discipline was based on impermissible criteria.

8. <u>Claim For June 28, 2004 RVR</u>

The claim concerning the June 28, 2004 RVR is dismissed for the separate and independent reason that the RVR did not affect the length of Mauzey's sentence. The RVR on its face indicates that no time credits were assessed. Therefore, no habeas relief is available on that claim.

**CONCLUSION**

The claims asserted by Mauzey in his habeas petition are all legally meritless. Accordingly, the petition for writ of habeas corpus is dismissed. Leave to amend does not appear to be appropriate, as the petition fails not because of a shortage of facts or pleading problems but because the law simply is not as Mauzey asserts.

The <u>in forma pauperis</u> application is GRANTED. (Docket # 2.)

The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 24_, 2006

Marilyn Hall Patel
United States District Judge